UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEPHANIE M. KUNTZ,                )
                                   )
         Plaintiff,                )
                                   )
     v.                            )   No. 4:12CV1796 SNLJ
                                   )                 (TIA)
CAROLYN W. COLVIN,                 )
ACTING COMMISSIONER OF             )
SOCIAL SECURITY,                   )
                                   )
         Defendant.                )

**REPORT AND RECOMMENDATION**

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Supplemental Security Income benefits under Title XVI of the Social Security Act. The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

**I. Procedural History**

On April 10, 2006, Plaintiff protectively filed an application for Supplemental Security Income. (Tr. 101, 241-43) Plaintiff claimed that she became unable to work on December 31, 1994 due to bipolar disorder and chemical dependency. (Tr. 241, 110) The application was denied on June 8, 2006, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 110-117) On February 24, 2009, Plaintiff testified at a hearing before the ALJ. (Tr. 56-69) In a decision dated April 2, 2009, the ALJ found that Plaintiff had not been under a disability at any time through the date of the decision. (Tr. 73-83) The Appeals Council remanded the matter on August 6, 2009. (Tr. 85-87) Plaintiff appeared at a second hearing on January 5, 2010. (Tr. 45-55) The ALJ then issued another decision denying Plaintiff's claim for

benefits on March 19, 2010. (Tr. 88-104) On April 20, 2011, the Appeals Council again remanded the case to the ALJ. (Tr. 105-09) After a third hearing held on July 27, 2011, the ALJ issued a decision on December 22, 2011, finding that Plaintiff had not been under a disability since protectively filing her application for supplemental security income. (Tr. 7-26) The Plaintiff then filed a request for review, which the Appeals Council denied on September 6, 2012. (Tr. 1-6) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At all three hearings before the ALJ, Plaintiff was represented by counsel. During her first hearing, Plaintiff testified that she was 21 years old. She was single and had three children, ages two, one, and four months. The kids lived with the father because Plaintiff could not take care of them. Plaintiff lived in an apartment with a friend, Dorothy. Plaintiff testified that she was unable to live alone because the voices she heard scared her, and she was afraid she would hurt herself. (Tr. 59-61)

Plaintiff took special education classes in school and completed the 11th grade. She left school because she was frustrated that she was not passing. Plaintiff attended night school at the direction of the county court, but she never finished. Plaintiff had completed parole and briefly worked for Schnucks as a bagger, at Taco Bell, and at McDonalds. She testified that she heard voices and had trouble concentrating, and she did not like people talking about her and making fun of her because of her problems. (Tr. 61-64)

Plaintiff stated that she last used street drugs in either the end of 2004 or beginning of 2005. While on parole, Plaintiff provided urine samples which were never dirty. Plaintiff saw Dr. Habib because she heard voices, felt scared of people, and had mood changes. Plaintiff explained that she had difficulty concentrating and was sometimes in her own world. She took Risperidone and Prozac.

2

Plaintiff had a driver's license but had never driven other than in driving school. She stated that she was too scared to drive because she thought she could hurt someone. During the day, Plaintiff watched TV and played PlayStation. She did not leave the house very often. If she went somewhere, she had someone go with her because she was afraid of getting lost. (Tr. 64-68)

Plaintiff did not have any income. She received Medicaid and food stamps. Plaintiff did not pay rent to live in her friend's apartment. (Tr. 68)

At the second hearing, Plaintiff testified that she couldn't remember if she was 22 or 23 years old. Plaintiff lived with her three children but could not take care of them by herself because she heard voices and could hurt them. She stated that she had never abused or neglected her children, nor had she been investigated regarding their care. Plaintiff also lived with her father and her friend, Dorothy. They cared for the children. Plaintiff had not worked anywhere since the last hearing. (Tr. 48-50)

She continued to see Dr. Habib every two to three months, and he prescribed medication to calm her anxiety attacks. Plaintiff heard voices every day but mostly at night. She had nightmares that interfered with her sleep. She slept about four or five hours a night and also slept during the day while she watched TV. She did not remember her anxiety attacks, but her friend told her that she shook really bad, her eyes moved back and forth quickly, and she became out of breath. Plaintiff experienced these episodes about once a week. She also had memory problems and forgot where she put things. The voices stopped her from concentrating and distracted her. Plaintiff did not cook or clean. She was afraid of having an anxiety attack and falling on cleaning chemicals. (Tr. 50-53)

Plaintiff no longer drove because she had too many accidents resulting from anxiety attacks. Plaintiff had not taken any illicit drugs or alcohol since the last hearing. She took her medication as

prescribed. She was nervous around other people and was afraid they were talking about her. She never left the house alone, as she did not know when she would have an anxiety attack or hear voices. Plaintiff received assistance for her children, and her friend managed the money. (Tr. 53-54)

During the third and final hearing, Plaintiff testified, along with a vocational expert ("VE"), Ms. Gonzalez. Plaintiff was 24 years old. She again testified that she completed the 11th grade and took special education classes. When she last attended school, she had one special education class with a teacher that helped with homework. Plaintiff last worked at McDonalds part-time for about a year. She measured 5 feet 4 inches and weighed 256 pounds. (Tr. 33-36)

Plaintiff testified that she had problems with substance abuse in the past. She last used cocaine in 2005. She also had a criminal conviction for domestic violence, although the record indicated a conviction for the sale of drugs. (Tr. 36-37)

During the day, Plaintiff woke up, showered, brushed her teeth, watched TV, and played PlayStation 2. She sometimes washed the dishes but did not do much housecleaning. She continued to live with Dorothy. Plaintiff testified that she heard voices that told her people were against her and trying to kill her. She also had anxiety attacks and trichotillomania, which caused her to pull out her hair when nervous. Plaintiff stated that she heard voices every day but sometimes only a couple times a week. The voices told her that people were trying to kill her and also told her to do things that she did not want to do. Plaintiff tried to ignore the voices but sometimes did what they told her. For instance, Plaintiff used to cut her wrists because the voices told her people were against her and did not want her here. When she left the house for doctor appointments or to go fishing, Plaintiff felt nervous. She did not leave alone, as her anxiety attacks caused her muscles to stiffen and caused her to fall. Without medication, Plaintiff had anxiety attacks daily. When she took her medication, she

4

had attacks once a week, but more when the weather was hot. Plaintiff continued to see a psychiatrist and took her mediation as prescribed. She did not sleep well due to the voices, and she felt tired during the day. She could sometimes concentrate and focus. For example, when reading a book, Plaintiff would lose focus and need to read the words over and over. (Tr. 37-40)

Also during the hearing, the ALJ questioned the VE regarding Plaintiff's ability to work. The ALJ first raised a hypothetical question with a claimant aged 18, with 11 years of education and no past relevant work. This person could perform a full range of light work with no climbing ropes, ladders, or scaffolds. In addition, the individual needed to avoid concentrated exposure to unprotected heights. Further, she could understand, remember, and carry out at least simple instructions and non-detailed tasks; should not work in a setting which includes constant or regular contact with the general public; and should not perform work which includes more than infrequent handling of customer complaints. In light of those restrictions, the VE testified that the individual could perform work as a housekeeper/cleaner, which was light and unskilled; and a hand presser, which was also light and unskilled. (Tr. 40-41)

For the next hypothetical, the ALJ asked the VE to accept as accurate the Mental Residual Functional Capacity Questionnaire completed by Dr. Habib. Based on Dr. Habib's answers, the VE stated that the hypothetical person would be unable to perform any work. (Tr. 41-42, 382-86) Plaintiff's attorney also asked the VE whether Plaintiff's multiple moderate limitations would significantly erode the occupational base when multiplied together. The VE answered that the limitations would erode the occupational base. (Tr. 42-43)

In a Function Report – Adult dated May 4, 2006, Plaintiff reported that she was homeless but frequently stayed with a friend. She stated that she tried to help around the house and do things but

5

was unsuccessful because she was easily distracted. She had trouble sleeping and was afraid. She often forgot to take her medication. With regard to meals, Plaintiff stated that she cooked two or three times a week and only made sandwiches because she could not concentrate long enough to use the stove or microwave. Plaintiff was unable to focus long enough to perform housework. Plaintiff tried to stay indoors because the voices she heard were worse outside. She reported that she could not handle money. She used to read and play sports but was no longer able to participate in these activities due to lack of concentration. Plaintiff kept to herself because she was embarrassed by her illness. She stated that her mental illness affected her ability to talk, hear, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. Plaintiff reported that she was unable to follow written or spoken instructions, and she did not get along with others or handle stress well. (Tr. 280-87)

Plaintiff's friend, Mary Pearson, completed a Function Report Adult – Third Party. Ms. Pearson stated that she had known Plaintiff for two years and that Plaintiff frequently spent weekends at Ms. Pearson's apartment. Ms. Pearson's report essentially mirrored Plaintiff's. (Tr. 271-78)

Plaintiff's father, David J. Kuntz, wrote a letter indicating that by the time Plaintiff was 11 years old, she was diagnosed with Trichotilimania and anxiety disorder. She then saw Dr. Clifton Smith until she was 16. Dr. Smith diagnosed bipolar disorder as well. Mr. Kuntz noted that Plaintiff had been hospitalized numerous times and had problems keeping friends and keeping a job. Plaintiff's bipolar disorder caused Plaintiff to fluctuate between being overly high and irritable to being sad and hopeless. Her disorder resulted in an inability to handle daily activities. (Tr. 299)

### III. Medical Evidence

In a letter dated March 23, 2004, Dr. Richard Anderson noted that he saw Plaintiff, who was 16 years old at the time. She had numerous prior psychiatric hospitalizations and had been on numerous medications for bipolar disorder and depression, most recently Lithium, Seroquel, and Prozac. When off her medications, Plaintiff became manic and depressed, and she displayed significant judgment problems and behavioral issues. When medicated, her mood, judgment, and mood swings improved. In school, she earned mostly As and Bs. Plaintiff denied auditory or visual hallucinations but possibly experienced paranoid delusions. The mental status exam was normal. Dr. Anderson assessed bipolar disorder and acne. He recommended that Plaintiff continue her medication regimen of Lithium and Seroquel, and he increased the dose of Prozac. (Tr. 369-71)

On May 7, 2005, Plaintiff was hospitalized for ongoing drug use. Dr. Donald E. Binz performed a consultative examination and noted Plaintiff's many previous admissions for substance abuse. Plaintiff acknowledged using crack cocaine regularly for the past 8 months. She had not been taking her prescribed medications. Physical examination was normal. Plaintiff displayed poor insight but appeared pleasant, with fluent speech and fair understanding. Dr. Binz assessed history of bipolar illness; history of crack cocaine abuse; and elevated SGPT, consider from fatty liver, rule out secondary to underlying hepatitis. (Tr. 361-63)

Plaintiff was admitted to the hospital again on May 26, 2005, after overdosing on Seroquel. She was diagnosed with Seroquel overdose; bipolar disorder; history of crack cocaine abuse; and abnormal UA. Plaintiff remained in the ICU for observation and was then transferred to Dr. Anderson's care. (Tr. 364-66) On June 21, 2005, Plaintiff returned to the hospital for

7

suicidal ideation. Dr. Jason M. Mitchell assessed bipolar disorder with acute suicidal ideation but noted that Plaintiff significantly improved from her admission and agreed to residential chemical dependency treatment over the next 30 days. (Tr. 359-60)

Dr. Anderson admitted Plaintiff to the hospital on December 12, 2005 for bipolar disorder and chemical dependency. Dr. Anderson noted that Plaintiff only stayed in the residential substance abuse facility for nine days. She stayed clean for a short time but then resumed cocaine use. Upon examination, Plaintiff's mood was depressed and her mood constricted. Flow of thought was logical and sequential, and her thought content was positive for suicidal thoughts. Her judgment and insight were limited. Dr. Anderson assessed bipolar disorder with clear evidence of mania and depression several times during the past year; crack cocaine dependency; and a GAF of 30.[1] Plaintiff was discharged to a chemical dependency residential treatment center with a GAF of 50. (Tr. 321-23)

Plaintiff saw Dr. Anderson in April and May of 2006. Dr. Anderson noted that Plaintiff was pregnant and could not take Lithium or Abilify. Dr. Anderson prescribed Haldol. In May,

---

[1] Under the Diagnostic and Statistical Manual of Mental Disorders, a GAF of 21 to 30 indicates behavior "considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment . . . OR inability to function in almost all areas . . . ." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF of 31 through 40 represents "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." Id. A GAF of 41 to 50 indicates "Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." Id. A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning," and a GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Id.

Plaintiff reported being drug free for four months. Plaintiff asked for increased Prozac for her anxiety attacks in June 2006. (Tr. 367)

On June 8, 2006, Judith McGee, Ph.D., completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique. In the assessment, she opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Dr. McGee further assessed no significant limitations in Plaintiff's ability to remember locations and work-like procedures; understand, remember, and carry out short and simple instructions; make simple work-related decisions; socially interact with others; be aware of normal hazards and take appropriate precautions; or travel in unfamiliar places or use public transportation. Dr. McGee stated that if Plaintiff abstained from chemical dependency, she retained the capacity for simple work with limited social interaction. (Tr. 324-26)

In the Psychiatric Review Technique, Dr. McGee assessed Bipolar Disorder and Chemical Dependency Disorder. She opined that Plaintiff had mild difficulties in activities of daily living and maintaining social functioning. She also found that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. Dr. McGee further noted that there was

insufficient evidence to determine whether Plaintiff experienced repeated episodes of decompensation, each of extended duration. (Tr. 327-39)

On February 27, 2007, Dr. Asif Habib saw Plaintiff for complaints of hearing voices for several years. She reported that she had always been paranoid that people were talking about her. Dr. Habib assessed schizophrenia, paranoid type and a GAF of 55. On April 17, 2007, Plaintiff reported doing well. She denied depression, psychosis, or manic feelings. Plaintiff was cooperative with fair insight and judgment. Dr. Habib assessed schizophrenia, paranoid type, and prescribed medications. Plaintiff continued to do well on June 26, 2007. She reported finding out that she was pregnant during a September 18, 2007 session. However, she was doing well with no depression or mania. Dr. Habib discussed the effect of medications on the fetus, and Plaintiff indicated that she wanted to continue taking meds. (Tr. 375-80)

Plaintiff returned to Dr. Habib on April 1, 2008, Plaintiff reported doing good. However, she heard some voices. Dr. Habib again assessed schizophrenia, paranoid type, and changed Plaintiff's medications. Dr. Habib completed a Mental Residual Functional Capacity Questionnaire on that same date. He noted that he saw Plaintiff for 20 minute sessions every two to three months. Dr. Habib assessed schizophrenia, paranoid type and a GAF of 50. Plaintiff was partially responding to medication. While she still heard voices, she had no paranoia; her depression was stabilized; and anxiety was still present. He noted that her thought processes were coherent and goal directed; her insight and judgment were fair; her memory was intact; her ability to handle stress was limited; her affect was blunted; and her prognosis was fair. With regard to Plaintiff's mental abilities and aptitude needed to do unskilled, semiskilled, or skilled work, Dr. Habib opined that she was unable to meet competitive standards in many categories. He reasoned

that Plaintiff was still actively hallucinating and dependent on others to help in her daily functioning. However, Dr. Habib further opined that Plaintiff was seriously limited but not precluded in her ability remember work-like procedures; understand and remember very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; deal with the stress of semiskilled and skilled work; interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. She had limited but satisfactory abilities to carry out very short and simple instructions; travel in unfamiliar place; and use public transportation. He believed Plaintiff would miss more than 4 days of work a month. Further, Dr. Habib stated that Plaintiff's impairment lasted at least 12 months and that Plaintiff was not a malingerer. (Tr. 381-86)

Plaintiff followed up with Dr. Habib approximately every two to three months from July 2008 through April 2011. During these sessions, Plaintiff reported doing well but hearing voices from time to time. She denied depression or manic episodes, and she reported that the medication helped her and did not cause side effects. Dr. Habib continued to diagnose schizophrenia, paranoid type and prescribe medications. He also consistently noted that Plaintiff was cooperative, with coherent and goal directed thought processes; intact memory; and fair insight, judgment, and concentration. (Tr. 388-401)

At the request of the state agency, Plaintiff saw Kimberly Buffkins, Psy.D., for a consultative examination on September 6, 2011. Dr. Buffkins noted that Plaintiff's appearance was remarkable for an overweight, unkempt, disheveled, white female who appeared to be her stated age. Plaintiff was cooperative and calm, with good eye contact. Her speech was coherent,

slightly slowed, normal toned. She was cooperative, made good eye contact, and had normal speech. Plaintiff's mood was normal with mildly blunted affect. Plaintiff reported no current active suicidal/homicidal ideation, delusions, or hallucinations. Cognitive testing was unremarkable, and she displayed normal insight and judgment. With regard to activities of daily living, Dr. Buffkins noted that Plaintiff did not pay bills, cook, or perform household chores. However, she went grocery shopping with someone accompanying her, sometimes attended church, and watched TV. Plaintiff reported getting along with people. Dr. Buffkins further noted that Plaintiff reported needing reminders to maintain appropriate grooming and hygiene as she sometimes forgot to shower, brush her teeth, or wear a bra. In addition, Dr. Buffkins rated Plaintiff's concentration, persistence, and pace as fair-to-adequate during the evaluation. Dr. Buffkins diagnosed mood disorder, not otherwise specified; psychosis, not otherwise specified; trichotillomania; cocaine dependence (prior history, remission uncertain); and a GAF of 55. Dr. Buffkins indicated that Plaintiff's prognosis was fair and that appropriate interventions could increase her ability to maximize her potential. (Tr. 402-06)

### IV.  The ALJ's Determination

In the decision dated December 22, 2011, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since April 10, 2006, the protective filing date of her application for Supplemental Security Income. Plaintiff's severe impairments included paranoid schizophrenia and obesity. However, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ assessed Plaintiff's schizophrenia under paragraphs B and C of Listing 12.03. (Tr. 10-15)

After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, which required lifting and carrying up to 20 pounds occasionally and 10 pounds frequently; sitting at least six hours out of eight; and standing/walking at least six hours out of eight. However, Plaintiff should never climb ropes, ladders, or scaffolds. The ALJ further found that Plaintiff could understand, remember, and carry out at least simple instructions and non-detailed tasks. Plaintiff should not perform work which involved constant/regular contact with the general public or involve more than infrequent handling of customer complaints. The ALJ then thoroughly assessed Plaintiff's medical records and her testimony and subjective allegations. (Tr. 15-24)

The ALJ determined that Plaintiff was unable to perform any past relevant work. She was a younger individual with a limited education and no transferability of job skills. In light of her age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform. Based on the VE's tesimony, the ALJ determined that Plaintiff could work as a housekeeper or hand presser. Thus, the ALJ concluded that Plaintiff had not been under a disability since April 10, 2006.

### V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required

14

which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two arguments in her Brief in Support of the Complaint. First, she asserts that the ALJ failed to support the RFC finding with substantial evidence from the record. Next,

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Plaintiff contends that the VE's testimony does not constitute substantial evidence because the hypothetical question does not capture the concrete consequences of Plaintiff's impairment. The Defendant maintains that substantial evidence supports the ALJ's RFC determination and that the ALJ properly included the limitations he found credible in the hypothetical posed to the VE. The undersigned finds that the ALJ properly determined and supported Plaintiff's RFC and that the hypothetical question properly included Plaintiff's impairments.

### A. The ALJ's Residual Functional Capacity Assessment

Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). With regard to RFC, "a disability claimant has the burden to establish her RFC." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

The record shows that the ALJ properly considered the medical evidence and based the RFC determination on that evidence. The ALJ first noted Plaintiff's treatment history, noting that during her most recent sessions with Dr. Habib, Plaintiff reported doing good. The ALJ also considered Dr. Habib's opinions in the Mental RFC Questionnaire and gave the findings substantial evidentiary weight to the extent that the opinions were consistent with the record as a whole. The ALJ noted that the GAF score of 50 was not consistent with Dr. Habib's own

16

objective medical findings, and Dr. Habib presented no objective medical evidence or treatment notes supporting his statement that Plaintiff would miss work more than four times a month. Instead, the treatment notes from ongoing sessions demonstrated that Plaintiff continued to do well on medication. (Tr. 18-20) An impairment that can be controlled by treatment or medication cannot be considered disabling. Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (citation and internal quotations omitted).

The ALJ explicitly agreed with Dr. Habib's findings that Plaintiff was not precluded in her ability to remember work-like procedures; understand and remember very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 18-19) Indeed, the ALJ incorporated Dr. Habib's opinion in the RFC determination.

Plaintiff argues, however, that the ALJ erred in giving greater weight to the opinion of Dr. Buffkins, a one-time consulting examiner, than to Dr. Habib. The record belies this assertion. First, as previously stated, the ALJ gave Dr. Habib's opinion substantial weight to the extent it was supported by the medical records. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). "An

17

ALJ may accord greater weight to a consulting physician only where the one-time medical assessment is supported by better or more thorough evidence or where a treating physician renders inconsistent opinions." Turner v. Astrue, No. 4:08-CV-107 CAS, 2009 WL 512785, at *11 (E.D. Mo. Feb. 27, 2009) (citation omitted).

Here, the record shows that the ALJ also gave significant, not greater, weight to Dr. Buffkins' opinion, which was based on diagnostic tests and objective medical findings from the evaluation. Other than the GAF finding[3] and the unsupported opinion regarding absenteeism, Dr. Buffkins' findings essentially mirrored Dr. Habib's treatment notes. Both assessed Plaintiff as cooperative mood and behavior; coherent thought process; and fair insight, judgment, and concentration. (Tr. 387-405) Contrary to Plaintiff's assertion, the ALJ need not rely entirely on a particular doctor's opinion or choose between the opinions. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (citation omitted). Instead, the ALJ must assess a plaintiff's RFC based on all relevant evidence in the record. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007).

The undersigned finds that the record supports the ALJ's determination that Plaintiff possessed the RFC to perform work, with the mental limitations of understanding, remembering, and carrying out at least simple instructions and non-detailed tasks; not performing work that includes regular contact with the general public; and not performing work that involves more than infrequent handling of customer complaints. Therefore, Plaintiff's first argument fails.

---

[3] "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002).

## B. Hypothetical Question to the VE

Plaintiff next argues that the hypothetical question posed to the VE failed to include all of Plaintiff's limitations, and, therefore, the VE's response did not constitute substantial evidence. The Defendant responds that hypothetical question properly included only those impairments and restrictions that the ALJ found credible.

The undersigned agrees that the ALJ posed a proper hypothetical question to the VE and that the VE's testimony that Plaintiff could perform work was substantial evidence in support of the ALJ's determination. "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Further, where substantial evidence supports an ALJ's finding that a plaintiff's complaints were not credible, the ALJ may properly exclude those complaints from the hypothetical question. Id.

In the instant case, the ALJ included only those impairments and limitations that he found credible. The ALJ asked the VE to assume an individual with Plaintiff's age, education, and no past work experience, who could work at a light exertional level. (Tr. 23-24) The ALJ also included those credible physical and mental limitations, such as never climbing ropes, ladders, and scaffolds; avoiding concentrated exposure to unprotected heights; understanding, remembering, and carrying out at least simple instructions and non-detailed tasks; not working in a setting which includes constant or regular contact with the general public; and not performing work which includes more than infrequent handling of customer complaints. (Tr. 41) These limitations are consistent with medical and other evidence in the record and with the ALJ's RFC determination.

Therefore, the undersigned finds that "[t]he hypothetical was sufficient because it represented a valid assessment of [Plaintiff's] . . . limitations consistent with the evidence in the record." Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001). Because the hypothetical question properly set forth Plaintiff's limitations, the VE's testimony constituted substantial evidence upon which the ALJ could properly rely in determining that Plaintiff was not disabled. Id. Therefore, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff had not been under a disability since April 10, 2006. The decision of the Commissioner should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of February, 2014.